UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                               Case No. 15-CR-83

TERRY CUNNINGHAM,
TAMARA MCARTHUR, et al.,

        Defendants.

REPORT AND RECOMMENDATION

I.     Introduction

On November 3, 2015, a grand jury in this district returned an eleven-count indictment against eight defendants with charges including possessing heroin with an intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (ECF No. 83.) Terry Cunningham and Tamara McArthur were among the defendants. Now pending are three pretrial motions: Cunningham's Motion to Suppress (ECF No. 63), his Motion to Suppress II (ECF No. 64), and McArthur's Motion to Return Property (ECF No. 124).

At the time the motions were filed, the policy of the presiding judge, District Judge J.P. Stadtmueller, was that he would resolve all motions in which the parties requested an evidentiary hearing, as they did here. Since then, Judge Stadtmueller amended that policy to now have the assigned magistrate judge issue a report and recommendation. Accordingly, this court conducted an evidentiary hearing and will offer recommendations on the motions.

**II.   Terry Cunningham's First Motion to Suppress (ECF No. 63)**

   **A.   Facts**

The United States Drug Enforcement Agency (DEA) conducted a long-term investigation into a drug organization headed by Kevin Arms and included members of the Cunningham family. Confidential informants told law enforcement that Arms devised a practice to traffic cocaine and other illicit drugs from states such as Florida to Milwaukee, Wisconsin. Rented vehicles were often used to transport the drugs. On July 25, 2013, a confidential informant reported that Jovan Cunningham was traveling in a rented vehicle to Atlanta, Georgia. A court order authorized law enforcement to track Jovan's mobile phone. On July 28, 2013, a GPS tracking device on Jovan's mobile phone showed that it was travelling north from Georgia toward Wisconsin.

Law enforcement officers from several law enforcement departments set up an "interdiction operation" on Interstate 94 in Racine County, Wisconsin. On July 29, 2013, DEA Special Agent James Krueger saw three vehicles travelling closely behind one

another heading northbound on Interstate 94 in northern Illinois. The order of the vehicles from front to back was a Chevrolet Suburban, a KIA Sorento, and a GMC Acadia. Based on information obtained from undercover officers, Agent Krueger knew that the Sorento and Acadia were rented to someone with the last name "Cunningham." (ECF No. 74, ¶¶ 3, 8.) Agent Krueger saw the Suburban pay the toll for the other two vehicles, giving him reason to believe that all three vehicles were travelling together. By following the vehicles Agent Krueger determined that they were travelling about ten miles-per-hour over the speed limit. Agent Krueger reported to surveillance units located in southern Wisconsin that the vehicles were approaching Wisconsin and that they were speeding.

At 2:26 a.m. officers first stopped the Acadia, the vehicle in back, in Racine County for speeding. Jovan Cunningham was in the Acadia. A short time later other officers pulled over the Sorento, the middle vehicle, approximately one mile north of where the Acadia was stopped. Najon Cunningham, Cierra McArthur, and Dionte Bernard were the occupants of the Sorento. Officers Brett Huston and Eric Donaldson of the Milwaukee Police Department then stopped the Suburban approximately five miles north of the location where the Sorento was pulled over. Officer Huston testified that the Suburban was traveling in excess of ten to fifteen miles-per-hour over the speed limit. Terry Cunningham, Cheryl McArthur, Tamara McArthur, and another passenger

3
Case 2:15-cr-00083-JPS   Filed 04/29/16   Page 3 of 19   Document 144

were in the Suburban. Huston approached the Suburban to gather information from the occupants, including the driver's license and vehicle's registration.

Detective Eugene Nagler of the Milwaukee Police Department along with his drug-sniffing dog Duke were in a patrol car participating in the interdiction operation. Officer Huston testified that, before he had an opportunity to write down the occupants' names, Detective Nagler arrived on the scene. Detective Nagler testified that he and Duke arrived on the scene about five to ten minutes after the Suburban was stopped. Although Agent Krueger's report from that evening originally stated that Detective Nagler arrived at 3:39 a.m. (over an hour after the Suburban was stopped), he testified at the hearing that that was a typo and that Detective Nagler arrived on the scene at 2:39 a.m.

After arriving on the scene Detective Nagler testified that he spoke with officers on scene for about five to ten minutes before retrieving Duke to sniff around the Suburban for the presence of drugs. When Duke alerted to the presence of controlled substances, officers searched the vehicle. During the search, officers opened a bag and found $8,000 in cash, various pieces of diamond jewelry, two small bags of marijuana, and several pills. The officers also searched a wallet and found cards in Terry Cunningham's name and a Wisconsin QUEST card. In a suitcase the officers seized "a Coffee-mate canister with removable bottom ('California Safe')," paper towels, a bottle of Dormin containing pills, and Coffee-mate powder. The police seized the above items.

4

Two days later the police opened a paper towel found in the canister and found a small bag of heroin.

**B.    Analysis**

Cunningham gives four reasons why the items discovered incident to the search of the Suburban should be suppressed: the officers' who stopped the vehicle (1) lacked authority to enforce traffic laws in Racine County, (2) detained the occupants for an unlawful amount of time before Duke alerted to the presence of controlled substances, (3) failed to establish that Duke possessed an adequate ability to discover controlled substances, and (4) lacked probable cause to seize the items in the vehicle.

*1.    Authority to Enforce Traffic laws in Racine County*

Cunningham initially argued that the police lacked probable cause to stop the Suburban for speeding. (ECF No. 63 at 5-6.) But in his post-evidentiary hearing brief he concedes that the government has established probable that the vehicle was speeding. (ECF No. 139 at 1.) However, he now raises an allegedly related argument: that the law enforcement officers who stopped the Suburban, including Agent Krueger and several Milwaukee Police detectives, were outside of their jurisdiction to enforce traffic laws in Racine County. (ECF No. 139 at 6-7.) And because the officers lacked the authority to stop the vehicle for speeding, Cunningham argues, the fruits of the subsequent search should be suppressed.

The government has not had an opportunity to respond to Cunningham's new argument concerning the scope of the officer's authority. Additionally, because Cunningham failed to raise this new argument concerning the scope of the officer's authority in his motion, he has waived the opportunity to raise it now. *United States v. Harris*, 394 F.3d 543, 559 (7th Cir. 2005). Even if the court were to consider the new argument, suppression does not follow from a finding of a lack of jurisdiction. "[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *United States v. Mikulski*, 139 F. Supp. 2d 1204, 1207 (D. Utah 2001), *aff'd,* 317 F.3d 1228 (10th Cir. 2003) (quoting *United States v. Green*, 178 F.3d 1099 (10th Cir. 1999)). For these reasons, the court rejects Cunningham's argument that the evidence should be suppressed because the stop transpired allegedly outside of the officers' jurisdiction.

    2.    *Detention of the Suburban*

Cunningham next argues that the officers detained the Suburban for an unlawful amount of time. (ECF No. 139 at 2-4.) He alleges that, after pulling the Suburban over, the officers immediately abandoned any investigation into the traffic violation. (ECF No. 139 at 2-3.) He contends that they had no other reason to detain the occupants, and yet he calculates that twenty-two minutes passed between the time the Suburban was stopped and when Duke was brought in to sniff around the exterior of the vehicle. He

6
Case 2:15-cr-00083-JPS   Filed 04/29/16   Page 6 of 19   Document 144

argues that the officers had no lawful reason to detain the occupants for that period of time.

Citing *Illinois v. Caballes*, 543 U.S. 405 (2005), the government responds that police may use a drug detection dog to sniff a vehicle as long as the traffic stop was not "unreasonably delayed." It argues that the officers had not completed the traffic stop of the Suburban when Duke and Detective Nagler began the sniff of the vehicle. (ECF No. 138 at 2.) Thus, there was no delay at all. To the extent there was any delay, it was based on the officers' reasonable suspicion of criminal activity resulting from Agent Krueger's investigation of the Arms' organization.

A routine traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The lawful duration of the traffic stop must be tailored to the purpose of the seizure—*i.e.*, to investigate and address the traffic violation. *Caballes*, 543 U.S. at 407. "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose.'" *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (quoting *United States v. Sharpe*, 470 U.S. 675, 684 (1985)). Typically such tasks incidental to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (2015) (citing *Delaware*, 440 U.S. at 658-60). If no other basis for the stop exists, then evidence seized after such a time must be suppressed. *Caballes*, 543 U.S. at 415.

For instance, the police officer in *Rodriguez* went beyond the time reasonably needed to execute the tasks associated with the traffic stop. After the justification for the traffic stop was "out of the way," the officer ordered the occupants to wait outside of the vehicle for seven to eight minutes until the drug-sniffing dog arrived. *Id.* The officer's conduct in *Rodriguez* is distinguishable from the officers' conduct here. Officer Huston did not postpone the tasks associated with the traffic stop to wait for Duke. To the contrary, according to uncontroverted testimony, Detective Nagler deployed Duke *while* Officer Huston was performing ministerial tasks associated with the traffic stop. This situation is directly analogous to lawful searches, such as in *Caballes*, where "the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation." 543 U.S. 405, 409 (2005); *see also United States v. Guidry*, No. 13-CR-16, 2014 WL 280383, at *5 (E.D. Wis. Jan. 24, 2014).

Moreover, the fact that the officers were also investigating illicit drug dealing or that they ultimately did not issue a speeding citation does not render the seizure unconstitutional. *See United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999) ("[A] traffic stop is ordinarily reasonable under the Fourth Amendment if the officer has probable cause to believe that there has been a motor infraction, regardless of the officer's subjective motives"). The officers were permitted to extend the time they detained Cunningham beyond the time needed to address the traffic violation based on the confidential informant's information that the occupants of one or more of the vehicles

8

may be involved in drug trafficking. *See Rodriguez*, 135 S.Ct. at 1614. The court finds that officers did not detain Cunningham for an unlawful amount of time before Duke alerted to the presence of drugs in the Suburban.

3. *Probable Cause for Warrantless Search of Vehicle*

Cunningham next argues that the government has failed to establish that Duke's ability to detect narcotics was sufficiently reliable. (ECF No. 139 at 7-8.) The United States Supreme Court has recently explained that

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013). The government provided Cunningham with evidence that Duke was awarded two training certificates, including one from the North American Police Work Dog Association (NAPWDA). Courts have recognized NAPWDA as a bona fide organization for training dogs in the detection of narcotics. *See, e.g., United States v. Rhee*, No. 3:12CR2, 2014 WL 2213079, at *3 (N.D. Ohio May 28, 2014). Detective Nagler also testified about Duke's daily training regimen and history of success in the field. Given this evidence, the court finds that Duke's ability to detect illicit drugs provided the officers with probable cause to search the Suburban.

Cunningham also argues that Detective Nagler's testimony that Duke alerted to narcotics by scratching at the back of the Suburban was contradicted by Agent Krueger,

who testified that he did not see Duke do so. (ECF No. 139 at 7.) However, Agent Krueger testified that he was not paying close attention to Duke and was not trained to identify Duke's alerts. The court is satisfied with Detective Nagler's testimony that Duke alerted to the presence of narcotics.

> 4. *Probable Cause to Seize Items*

Cunningham next argues that the officers did not have probable cause to seize the $8,000 in cash, the diamond necklace, and the Coffee-Mate canister with a false bottom containing Dormin. (ECF No. 139 at 8-10.) According to Cunningham, under the plain view doctrine the incriminating nature of the item seized must be "immediately apparent." The cash and jewelry were not contraband, and the canister, while unusual, seemingly did not contain drugs (they were only found later after the canister was seized) and thus no basis existed for seizing any of them. The government responds by stating that Agent Krueger's training and experience informed him that the items seized were evidence of drug trafficking. (ECF No. 138 at 3.)

"When an officer (1) lawfully present (2) sees something in plain view (3) the incriminating nature of which is immediately apparent, the officer may seize the item without a warrant." *United States v. Tolbert*, No. 11-CR-186, 2012 WL 404875, at *4 (E.D. Wis. Feb. 7, 2012) (citing *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997)). "The 'incriminating nature' element means that the officer must have probable cause to believe that the item is linked to criminal activity." *Id.* (quoting *Horton v. California*, 496

U.S. 128, 136-37 (1990)). Indeed, law enforcement "may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004) (collecting cases).

Although Cunningham is correct that possessing these items was not inherently illegal, the officers had probable cause to believe they were evidence and fruit of drug trafficking. At the time of the seizure, the officers knew of a confidential informant's statements that associated the Cunningham family with a drug trafficking network; knew that Duke had alerted to the presence of drugs in the Suburban; and discovered marijuana in the Suburban. Agent Kreuger testified that, although Dormin is sold over-the-counter as a sleep-aid medicine, it is also used as a cutting agent with heroin. The officers discovered the Dormin in a hidden chamber of a canister disguised as a coffee container. Moreover, Cunningham possessed a QUEST Card (used by indigent persons to purchase groceries and other essentials). All of this information together gave the officers probable cause to believe that the large amount of cash and the diamond necklace were not only fruit of illicit drug dealing but also were evidence of criminal fraud, *see* Wis. Stat. § 943.201(2). The court finds that the officers possessed probable cause to believe that the items seized were the fruit or evidence of a crime and therefore recommends that Terry Cunningham's Motion to Suppress (ECF No. 63) be denied.

**III. Terry Cunningham's Second Motion to Suppress (ECF No. 64)**

On March 4, 2015, Agent Krueger submitted an affidavit in support of a warrant to search three residences, including the home of Cunningham and McArthur at 3030 N. 38th Street in Milwaukee, Wisconsin. (ECF No. 42-2.) Based on that affidavit, Magistrate Judge Nancy Joseph signed a search and seizure warrant. (ECF No. 64-1.) The warrant permitted officers to seize, among other things, items related to food stamp fraud and wire fraud. (*See* ECF No. 64-1 at 4-5.) Cunningham argues that the affidavit fails to establish probable cause that the officers would find evidence of food stamp fraud and wire fraud at his residence. He also contends that the warrant is not sufficiently particular as required by the Fourth Amendment.

**A.  Probable Cause Determination**

Cunningham first argues that Krueger hypothesized that Cunningham and McArthur were engaged in food stamp or wire fraud because their expenditures greatly exceeded their income as reported when they applied for food stamps. However, according to Cunningham, Krueger did not determine whether Cunningham or McArthur were able to fund their expenditures through means other than reportable income—for example, through loans, gifts, an inheritance or by liquidating assets. Without that information, he lacked probable cause for believing that Cunningham or McArthur were engaged in food stamp or wire fraud or that evidence of such crimes would be found at their home. (ECF No. 64 at 2-8.)

The government responds that Krueger's affidavit set forth ample facts sufficient to provide probable cause for the issuance of the warrant. Specifically, it points out that the DEA had been investigating whether Cunningham and McArthur were trafficking heroin. (ECF No. 64-2, ¶ 9.) Throughout the investigation law enforcement obtained information through wiretaps, traffic stops, and surveillance. (*See, e.g.*, ECF No. 64-2, ¶ 11-22.) Financial records indicated that Cunningham and McArthur lacked legitimate employment and little to no income. (ECF No. 64-2, ¶¶ 47, 55.) Notwithstanding the lack of income, Cunningham and McArthur made purchases seemingly beyond their means. Among the numerous examples of lavish expenditures: one source said that Cunningham bought a gold necklace containing twenty-nine diamonds for $13,000. (ECF No. 64-2, ¶ 53.) Considering all of the facts set forth in the affidavit, the government argues, it provided a sufficient basis for the issuance of the warrant. In any event, relying on *United States v. Leon*, 468 U.S. 897 (1984), the government argues that "the evidence obtained during the search need not be suppressed because law enforcement obtained the evidence through objective good faith reliance on a facially valid search warrant." (ECF No. 73 at 6.)

Review of a magistrate judge's issuance of a search warrant is limited. A magistrate judge's determination of probable cause is afforded "considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances

from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. Newsom*, 402 F.3d 780, 782 (7th Cir. 2005); *United States v. Spry,* 190 F.3d 829, 835 (7th Cir. 1999); *see also United States v. Farmer,* 543 F.3d 363, 377 (7th Cir.2008) (holding that a reviewing court will "defer to the determination of the warrant-issuing judge that probable cause existed so long as there is substantial evidence in the record supporting the judge's decision") (internal quotation omitted).

The court finds that Krueger's twenty-three-page affidavit offered a substantial basis to believe that the officers would find evidence of criminal activity at Cunningham's residence. In addition to the facts set forth above, the affidavit charted the family's claimed income and compared it to their expenditures from 2010 to 2014. (ECF No. 64-2, ¶¶ 47-55.) Each year McArthur and Cunningham separately had net income between $3,000 and $67,000. (ECF No. 64-2, ¶¶ 47-55.) Even though the affidavit may not have accounted for all of the family's assets and other sources of funds that could be used to pay for expenditures, probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 245 (1983). The affidavit meets that standard. It offered specific facts to provide Magistrate Judge Joseph with a substantial basis for concluding that probable cause existed that Cunningham's residence contained evidence of food stamp and/or wire fraud.

14

Even if the warrant was not supported by probable cause, the officers obtained the evidence through an objective good faith reliance on the warrant such that suppression would not be warranted. *Leon*, 468 U.S. at 920.

### B.    Particularity

Cunningham next argues that the warrant was "not sufficiently particularized, is overbroad, and/or the agents seized items outside the scope of the warrant." (ECF No. 64 at 8-12.) He asserts that neither the warrant nor the officers attempted to limit the seizure of evidence to only those electronic devices (primarily computers and cellular telephones) containing information related to food stamp fraud. He also complains that the warrant did not limit the type of searches that the officers could conduct of the electronic devices once seized.

In response, the government first notes that three computers were seized during the search but have never been searched and will be returned. (ECF No. 73 at 7-8.) Thus, the only remaining dispute relates to data seized from cellular telephones. As to them, the government argues the affidavit supporting the warrant is sufficiently detailed. "It describes the offenses allegedly committed by the defendants, their use of 3030 N. 38th St. and computers or cell phones contained in the house to commit those offenses, and describes particular categories of evidence to be seized which relate to the described offenses." (ECF No. 73 at 9.) The warrant permits the search for records that

might be found in the house, in whatever form they are found, including data stored on a cell phone.

The Fourth Amendment "categorically prohibits" the issuance of a warrant that does not describe with particularity the objects to be seized. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The particularity requirement serves the vital function of preventing unauthorized invasions in the sanctity of a person's home and preventing the police from indiscriminately rummaging through his property. *United States v. Jones*, 54 F.3d 1285, 1289-90 (7th Cir. 1995). "As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." *Id.* at 1290 (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). "In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit." *Id.* (quoting *United States v. Brown*, 832 F.2d 991, 996 (7th Cir. 1987)). A court determines whether a warrant meets the particularity requirement by evaluating whether "an executing officer reading the description in the warrant would reasonably know what items are to be seized." *United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998). However, "[i]f detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." *Id.*

In this case the warrant contains several limitations on what items and data may be seized. Officers could only seize evidence relating to violations of the food stamp

and wire fraud statutes. (ECF No. 64-1, ¶ 1.) For any computer or storage devices seized, the warrant enumerated ten specific categories of data that officers could seize, including "evidence of who used, owned, or controlled the computer," "evidence of the times the computer was used," "records of or information about the computer's Internet activity," and "passwords, encryption keys, and other access devices[.]" (ECF No. 64-1, ¶ 2.)

Cunningham argues that these limitations should have gone further and restricted "the type of search that the agents can conduct of each computer seized…." (ECF No. 64, ¶ 17.) But the Court of Appeals for the Seventh Circuit has not required search warrants of computers to include search protocols. *United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010). Instead, it has "simply counsel[ed] officers and others involved in searches of digital media to exercise caution to ensure that warrants describe with particularity the things to be seized and that searches are narrowly tailored to uncover only those things described." *Id.* Given the limitations contained in the search warrant, the officers were able to ascertain the things to be seized with reasonable certainty. *See United States v. Sleet*, 54 F.3d 303, 307 n.1 (7th Cir. 1995).

Cunningham alternatively argues that, even if the descriptions in the warrant of the items to be seized are particular enough, the officers indiscriminately seized all of the information on the cell phones. However, Cunningham identify what data seized by the officers falls outside of the warrant's scope. Because the warrant is sufficiently

17
Case 2:15-cr-00083-JPS   Filed 04/29/16   Page 17 of 19   Document 144

particular within the meaning of the Fourth Amendment and Cunningham has not identified any item seized outside of the warrant's scope, the court recommends that his motion (ECF No. 64) be denied.

## IV. Tamara McArthur's Motion for Return of Seized Property (ECF No. 109)

Tamara McArthur filed a Motion for Return of Seized Property. (ECF No. 109.) On March 5, 2015, Magistrate Judge Nancy Joseph signed a search warrant authorizing the government to seize a check from McArthur in the amount of $58,516.44. Case No. 15-mj-810-NJ. On July 21, 2015, District Judge J.P. Stadtmueller issued an order under 21 U.S.C. § 853 authorizing the government "to maintain and preserve the seized asset until this criminal case is concluded or pending further order of this Court." (ECF No. 54 at 2.) McArthur requests an order requiring the government to return a portion, $38,616.44, of the amount it seized. (ECF No. 109.) However, such an order would conflict with the order issued by Judge Stadtmueller on July 21, 2015. Any motion requesting a change to the status of the seized property will need to be presented to Judge Stadtmueller.

**IT IS THEREFORE RECOMMENDED** that defendant Terry Cunningham's Motion to Suppress (ECF No. 63) be **denied**.

**IT IS FURTHER RECOMMENDED** that defendant Terry Cunningham's Motion to Suppress II: Search Warrant (ECF No. 64) be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), which govern written objections to any recommendation herein or part thereof. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file an objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 29th day of April, 2016.

WILLIAM E. DUFFIN
U.S. Magistrate Judge